UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERUM SHIRAZI, <br><br> Plaintiff, <br><br> -v- <br><br> CITIBANK, N.A., LVNV FUNDING, LLC, *and* RESURGENT CAPITAL ENTERPRISES L.P., <br><br> Defendants. | 25 Civ. 2992 (PAE) <br><br> <u>OPINION & ORDER</u> |

PAUL A. ENGELMAYER, District Judge:

This case involves claims that defendants Citibank, N.A. ("Citibank"), LVNV Funding,

LLC ("LVNV"), and Resurgent Capital Services, L.P. ("Resurgent") (together, "defendants")

violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*  Plaintiff Erum

Shirazi alleges that defendants incorrectly attributed debts incurred on two credit cards to her,

when in fact an unknown identity thief opened these accounts under her name and used the cards

without her knowledge or permission.

Pending now are defendants' motions to compel arbitration of Shirazi's claims.  For the

following reasons, the Court defers resolution of these motions, pending discovery (and

supplemental briefing) on whether Shirazi opened the accounts at issue.

I.      **Factual Background**[1]

A.      **The Parties**

Shirazi is a New York resident.  Dkt. 1 ("Compl.") ¶ 14.

---

[1] The Court draws these facts from the Complaint, Dkt. 1; declarations submitted by Citibank, Dkts. 25-2 ("First Sabo Decl."), 32-1 ("Supp. Sabo Decl."); Shirazi's declaration, Dkt. 30-1 ("Shirazi Decl."); a declaration submitted by LVNV and Resurgent, Dkt. 33-10 ("Sexton Aff.");

Citibank is a national bank incorporated in South Dakota and headquartered in New York City. *Id.* ¶ 15; Dkt. 25-2 ("First Sabo Decl.") ¶ 1.

LVNV is a foreign limited liability corporation. Compl. ¶ 17. Resurgent is a foreign limited partnership. *Id*. ¶ 19. LVNV has no employees; Resurgent manages its assets. Dkt. 33-10 ("Sexton Aff.") ¶¶ 1, 3–4. LVNV and Resurgent are authorized to do business in New York through registered agents there. Compl. ¶¶ 17, 19. LVNV and Resurgent acquire the value of personal credit card accounts from lenders such as Citibank and seek to collect these debts from individual debtors. *See* Sexton Aff. ¶¶ 9–14.

**B.      Citibank Issues Three Credit Cards Under Erum Shirazi's Name**

Shirazi's claims concern charges incurred on two credit cards which bear her name and were issued by Citibank or its subsidiary, Department Stores National Bank. These are a Best Buy credit card ending -4794 (the "Best Buy account") and a Citi Diamond Preferred credit card account ending -9121 (the "Diamond account"). The parties disagree whether Shirazi, or an identity thief posing as her, opened these accounts. Defendants' motion to compel arbitration also implicates a third credit card account, which Citibank also issued and which Shirazi acknowledges opening: a Macy's credit card ending -0726 (the "Macy's account"). *See* Dkt. 30-1 ("Opp'n") at 8. The Court first reviews the Macy's account, and then the disputed Best Buy and Diamond accounts.

---

and card agreements and periodic billing statements, Dkts. 25-3–25-5 (Best Buy account), 25-6–25-8 (Diamond account), Dkts. 25-9–25-10 (Macy's account). On a motion to compel arbitration, the Court applies a standard "similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). The Court therefore may consider materials outside the Complaint, such as affidavits and other admissible evidence. *See, e.g.*, *HBC Solutions, Inc. v. Harris Corp.*, No. 13 Civ. 6327, 2014 WL 6982921, at *1 (S.D.N.Y. Dec. 10, 2014).

### 1.    The Macy's Account

In approximately July 2016, Shirazi opened the Macy's account.  First Sabo Decl. ¶¶ 17–18.  This credit card was issued by Department Stores National Bank, a Citibank subsidiary.  *See* Dkt. 25-9 ("Macy's Agreement") at 4.  Billing statements for the Macy's account list Shirazi's address as 341 E. 70th Street, New York, New York (the "Manhattan address").  *See, e.g.,* Dkt. 25-10 ("Macy's Statements") at 1.  Shirazi does not dispute that this address is hers; that she opened the Macy's account; or that she made purchases and paid debts incurred on this card.  *See* Opp'n at 8.

Citibank submitted an exemplar card agreement for this account, which, its representative attests, was provided to Shirazi when she opened the account in July 2016, but which would have been "amended from time to time."  First Sabo Decl. ¶ 18; *see* Macy's Agreement.  The Macy's exemplar agreement is a "Notice of Change in Terms," dated April 24, 2018, and addressed to another consumer (whose name and other identifying information are redacted).  *See* Macy's Agreement at 7.

The agreement contains an arbitration provision, which provides, *inter alia*:

- "*You or we may arbitrate* any claim, dispute or controversy between you and us arising out of or related to your account, a previous related account or our relationship (called 'Claims')."  *Id.* at 5 (emphasis in original).

- "**[W]e, us, and our** mean Department Stores National Bank, the issuer of your account."  *Id.* at 4 (emphasis in original).

- "Claims" are subject to arbitration, including when "made by or against anyone connected with us or you or claiming through us or you, or by someone making a claim through us or you, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company."  *Id.* at 5.

As of July 2018—the most recent billing period reflected in documents submitted by defendants—the account had been fully paid off.  Macy's Statements at 1; First Sabo Decl. ¶ 22.

3

### 2.    The Disputed Best Buy Account

In approximately September 2015, Citibank issued the Best Buy credit card under the name "Erum Shirazi."  First Sabo Decl. ¶ 6; *see also* Dkts. 25-4 ("Best Buy Statements I"), 25-5 ("Best Buy Statements II").  According to transaction information submitted by Citibank, the earliest transaction using the card occurred on July 30, 2019.  First Sabo Decl. ¶ 10; Best Buy Statements II at 71.  The account statements list the account holder's mailing address as 1 Domino Way, Centereach, NY 11720-2887 (the "Centereach address").  *See, e.g.*, Best Buy Statements I at 1.

Citibank submitted an exemplar cardholder agreement for this account, also containing an arbitration provision.  Dkt. 25-3 ("Best Buy Agreement").  A Citibank representative attests that the agreement was provided to Shirazi in September 2015, but would have been "amended from time to time."  *See* First Sabo Decl. ¶¶ 6–7.  The agreement bears the mark "©2022 Citibank, N.A."  Best Buy Agreement at 9.  The Best Buy exemplar card agreement provided by Citibank contains the following arbitration provision:

> *You or we may arbitrate* any claim, dispute or controversy between you and us arising out of or related to your Account, a previous related Account or our relationship (called "Claims").

Best Buy Agreement at 6 (emphasis in original).

Shirazi disputes entering into the Best Buy cardholder agreement containing the arbitration provision.  Shirazi Decl. ¶¶ 4–9.  She attests that she "cannot recall" whether she opened the Best Buy card, *id*. ¶ 4; never "adopt[ed] any new terms over the years" the account was open, *id*. ¶ 5; never used the Best Buy card, *id*.; and never made any payments on the account, *id.*  She attests that she has never lived at the Centereach address, to which Citibank sent

the billing statements for this account, and which is the only address associated with it.  *Id.* ¶ 7; *see, e.g.*, Best Buy Statements I at 1.

The last payment toward the Best Buy account was made in March 2021, but was returned and not applied to the account.  First Sabo Decl. ¶ 10.[2]  By September 2021—the month of the most recent Best Buy billing statement submitted in this litigation—the account reflected an unpaid balance of $6,247.86.  Best Buy Statements I at 1.

### 3.    The Disputed Diamond Account

In approximately August 2017, Citibank issued the Diamond credit card under Shirazi's name.  First Sabo Decl. ¶ 11; *see also* Dkts. 25-7 ("Diamond Statements I"), 25-8 ("Diamond Statements II").  On August 31, 2017, Citibank mailed an account approval notice for this card to Shirazi's Manhattan address, addressed to her name.  First Sabo Decl. ¶ 12; Dkt. 25-6 ("Diamond Agreement") at 1.  Citibank submitted an account approval notice with an exemplar cardholder agreement, dated August 31, 2017, containing an arbitration provision.  *See* Diamond Agreement at 1, 13; First Sabo Decl. 12.  The Diamond card at issue bears an account number ending -9121, *see* First Sabo Decl. ¶¶ 11–12, but the August 31, 2017 account approval notice and card agreement with Shirazi's name correspond to an account number ending -5268, *see* Diamond Agreement at 1.  Citibank does not explain why these numbers differ.

Transaction records for the Diamond account reflect that the first purchase on the -9121 card was made on January 2, 2019, at a 7-Eleven in Centereach, New York.  Diamond Statements I at 2.  Like those for the Best Buy account, billing statements for the Diamond account list the account holder's address as the Centereach address.  *See, e.g.*, *id.* at 1.  The

---

[2] The parties do not explain why this payment was returned.

Diamond card agreement contains an arbitration provision identical in relevant part to the Best Buy provision reproduced above.  *See* Diamond Agreement at 13.

Shirazi denies entering into the Diamond cardholder agreement containing that provision. Shirazi Decl. ¶¶ 5–9.  She attests that she did not open the Diamond card, *id.* ¶ 8; never "adopt[ed] any new terms over the years" the account was open, *id.* ¶ 5; never used the Diamond card, *id.* ¶¶ 5, 9; and never made any payments on the account, *id.* ¶ 5.  She attests that she has never lived at the Centereach address, to which Citibank sent the billing statements for the Diamond account.  *Id.* ¶ 7; *see, e.g.*, Diamond Statements I at 1.

The last payment toward the Diamond card was made in February 2024, but was similarly returned and not applied to the account.  First Sabo Decl. ¶ 16.[3]  By January 2024, in the last billing statement provided with respect to the Diamond card, the account reflected an unpaid balance of $2,309.85.  Diamond Statements II at 77.

### C.    Citibank Assigns Debt Ostensibly Owed by Shirazi Under the Best Buy Account to Resurgent and LVNV

In November 2021, Citibank sold and assigned all rights arising from multiple consumer credit card accounts to Resurgent Acquisitions LLC ("RALLC").  These included the Best Buy account.  Dkt. 32-1 ("Supp. Sabo Decl.") ¶ 4.[4]  RALLC then assigned such rights for the Best Buy account to LVNV.  Sexton Aff. ¶ 17.  LVNV outsourced management of its portfolio, which included the Best Buy account, to Resurgent.  *Id.* ¶¶ 3–8.

Citibank still owns the Diamond account and any debt under it.  First Sabo Decl. ¶ 11.

---

[3] The parties do not explain why these payments were returned.

[4] Although the original declaration of Steven Sabo supporting Citibank's motion to compel arbitration stated that Citibank owned the Best Buy account, *see* First Sabo Decl. ¶ 5, Citibank filed a supplemental declaration by Mr. Sabo with its reply, attesting that, in fact, it sold the Best Buy account to RALLC on November 24, 2021, *see* Supp. Sabo Decl. ¶ 4.

**D.      The Complaint's Allegations that Shirazi's Credit Reports Wrongly Attribute to Her Unpaid Debts from the Best Buy and Diamond Accounts**

In her Complaint, Shirazi alleges the following.  In approximately spring 2023, she learned that credit reporting agencies Trans Union, Experian, and Equifax (the "CRAs") were reporting that she owed overdue, unpaid debts from accounts associated with Citibank, LVNV, and Resurgent.  Compl. ¶¶ 6, 21–24. She then filed a police report relating to these "fraudulent accounts."  *Id.* ¶ 26.  (Shirazi's later declaration, submitted in opposition to this motion, clarified that the accounts to which the police report referred were the Best Buy and Diamond accounts. Shirazi Decl. ¶¶ 4–9.)  In April 2023, Shirazi sent dispute letters to the CRAs, explaining that she had been a victim of identity theft and including information regarding the police report she had filed.  *Id.* ¶ 26.  The CRAs forwarded her correspondence to Citibank, LVNV, and Resurgent. *Id.* ¶¶ 35, 43–51.  Citibank, LVNV, and Resurgent wrongly verified that the information they had provided to the CRAs was correct, *id.* ¶¶ 42, 55, notwithstanding Shirazi's identity-theft claims.  The CRAs therefore continue to attribute debts under the Best Buy and Diamond accounts to Shirazi.

The Complaint brings claims under the FCRA.  These allege that defendants reported these fraudulent debts without having conducted a reasonable investigation of Shirazi's disputes, corrected their reporting to the CRAs pursuant to such an investigation, or notified other credit reporting agencies of the disputes.  *Id.* ¶¶ 97–131.  It also claims that Citibank unlawfully accessed Shirazi's credit report in issuing the Best Buy and Diamond accounts.  *Id.* ¶¶ 132–39.

## II.      Relevant Procedural History

On April 10, 2025, Shirazi filed the Complaint.  Dkt. 1.

On September 10, 2025, Citibank moved to compel arbitration, attaching a supporting memorandum of law, Dkt. 25-1 ("Citibank Mot."), declaration, Dkt. 25-2, and exhibits, Dkts. 25-

3–25-10.  On October 1, 2025, Shirazi opposed, attaching a supporting declaration.  Dkts. 30

("Opp'n to Citibank"), 30-1.  On October 8, 2025, Citibank replied, attaching a supplemental

declaration.  Dkts. 32 ("Citibank Reply"), 32-1.

On October 20, 2025, LVNV and Resurgent together moved to compel arbitration,

Dkt. 33 ("LVNV/Resurgent Mot."), filing a supporting memorandum of law, Dkt. 34, and

attaching declarations and exhibits, Dkts. 33-1–33-14.  On November 10, 2025, Shirazi opposed

this motion.  Dkt. 41 ("Opp'n to LVNV/Resurgent").  On November 24, 2025, LVNV and

Resurgent replied.  Dkt. 44 ("LVNV/Resurgent Reply").  On February 18, 2026, the Court

directed the parties to engage in further discovery and supplemental briefing on whether Shirazi

agreed to arbitrate these claims, stating that this decision would follow.  Dkt. 48.

### III.    Legal Standards Governing Motions to Compel Arbitration

Under the FAA, an arbitration agreement "shall be valid, irrevocable, and enforceable,

save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C.

§ 2.  To decide whether a dispute is arbitrable, a court assesses: "(1) whether the parties agreed to

arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue."

*Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015).  "Only if the court

concludes an agreement to arbitrate exists does it determine . . . the scope of the agreement to

arbitrate."  *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022).

On a motion to compel arbitration, "courts apply a 'standard similar to that applicable for

a motion for summary judgment.'"  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d

Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)).  Courts thus

"consider all relevant, admissible evidence submitted by the parties and contained in pleadings,

depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and

8

"draw all reasonable inferences in favor of the non-moving party." *Id.* (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)).

A party moving to compel arbitration "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (citation omitted). The moving party need not "show initially that the agreement would be enforceable, merely that one existed." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (emphasis omitted) (summary order). Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala v. Randolph*, 531 U.S. 79, 91–92 (2000)).

"[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (citation omitted). Where "there is a disputed question of material fact" as to formation of an agreement to arbitrate, courts hold a trial on that threshold issue before reaching the merits of the parties' dispute. *Barrows*, 36 F.4th at 49; *see* FAA § 4.

## IV.    Discussion

Defendants argue that the arbitration agreements associated with the Macy's, Best Buy, and Diamond accounts each supplies a basis to compel arbitration of Shirazi's claims that charges on the Best Buy and Diamond accounts were errantly attributed to her. *See* Dkt. 25-1 ("Citibank Mot.") at 10–12. The Court first resolves a threshold choice-of-law question. It then considers whether Shirazi entered into the agreements under the Best Buy and Diamond

9

accounts, and finds that factual disputes require additional discovery and briefing. It then considers the Macy's account, whose arbitration clause, the Court holds, does not cover disputes arising from the other two accounts.

### A.      Choice of Law

"[T]he ultimate question of whether the parties agreed to arbitrate is determined by state law." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002). Shirazi argues that New York's choice-of-law balancing test applies to what law governs whether she agreed to arbitrate her claims. Opp'n at 5. Defendants argue that South Dakota law applies, based on the choice-of-law provision in each card agreement at issue. *See* Citibank Mot. at 9.[5] Shirazi is correct.

"Applying the choice-of-law clause [in a contract] to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)); *see also Pegasus Aviation IV, Inc. v. Aerolíneas Austral Chile, S.A.*, No. 8 Civ. 11371, 2012 WL 967301, at *5 (S.D.N.Y. Mar. 20, 2012) ("It would make little sense to resort to law simply because it was designated by a contract provision in order to determine whether that very contract is even operative."). The South Dakota choice-of-law provisions in the Best Buy and Diamond card agreements thus do not determine what forum's law applies here. Instead, the choice-of-law rules of New York—the forum state—apply. *See Kulig v. Midland Funding, LLC*, No. 13 Civ. 4715, 2013 WL 6017444, at *3 (S.D.N.Y. Nov. 13, 2013) (New York choice-of-law rules applied where contract-formation issue did not implicate significant federal policy and turned on

---

[5] *See* Diamond Agreement at 14 ("Federal law and the law of South Dakota govern the terms and enforcement of this Agreement."); Best Buy Agreement at 7 ("Federal law and the law of South Dakota, where we are located, govern the terms and enforcement of this Agreement"); Macy's Agreement at 4 ("Federal law and the law of South Dakota, where we are located, govern the terms and enforcement of this Agreement.").

state law).  Under those rules, "[t]he first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved."  *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993).  "Where the applicable law from each jurisdiction provides different substantive rules, a conflict of laws analysis is required."  *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

Here, the New York and South Dakota law governing formation of consumer credit card agreements differ materially.  Under the law of both states, without a signed card agreement, courts find mutual assent to the terms of a consumer credit agreement where the consumer uses a credit card after receiving the terms of its related card agreement.  *See Tsadilas v. Providian Nat. Bank*, 786 N.Y.S.2d 478, 480 (1st Dep't 2004) (under New York law, consumers assent to card agreement by using card and "failing to opt out" after receiving terms of card agreement); *Dalal v. Costco Wholesale*, No. 22 Civ. 5593, 2023 WL 2662347, at *3 (D.N.J. Mar. 28, 2023) (under South Dakota law, a "cardholder's decision to use a credit card he or she has been issued constitutes assent to the terms of the offer extended by the card's issuer, such that a binding contract is formed").  But, unlike New York law, South Dakota law provides that mutual assent also occurs even if the consumer has not used the card, once more than 30 days pass after she receives the card agreement's terms and does not affirmatively object to them.  *See Haynes v. TransUnion, LLC*, No. 19 Civ. 7157, 2021 WL 7906567, at *6 (E.D.N.Y. Sept. 30, 2021) ("[U]nder South Dakota law, 'use of an accepted credit card or the issuance of a credit card agreement and the expiration of thirty days from the date of issuance without written notice from a card holder to cancel the account creates a binding contract between the card holder and the card issuer.'" (quoting S.D. Codified Laws § 54-11-9)), *adhered to on reconsideration*, 2022

11

WL 1228927 (Apr. 25, 2022).  The Court thus applies New York's choice-of-law balancing to

determine whether to apply New York or South Dakota law.[6]

Under New York's choice-of-law rules, courts look to the "center of gravity" or

"grouping of the contacts" in contract cases to determine which state law to apply.  *Tri-State*

*Emp't Servs., Inc. v. Mountbatten Sur. Co.*, 295 F.3d 256, 260–61 (2d Cir. 2002) (citation

omitted).  Factors to be considered include "the places of negotiation and performance; the

location of the subject matter; and the domicile or place of business of the contracting parties."

*Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001) (quoting *Zurich Ins.*

*Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 318 (1994)).

The center of gravity here strongly favors applying New York law to the question of

contract formation.  The first factor is indeterminate on the current record, which does not reflect

where the parties ostensibly negotiated or entered into the agreements at issue.[7]  The second

factor—the parties' respective residencies—is in equipoise or slightly favors New York, because

Shirazi is a New York resident and Citibank resides in both New York and South Dakota.  *See*

*Tri-State Emp't Servs.*, 295 F.3d at 261 (determining corporation residency from principal place

of business and incorporation); Compl. ¶¶ 14–15.  The final factor—location of the disputed

subject matter—is the most important, *In re Allstate Ins. Co.*, 81 N.Y.2d at 226, and strongly

---

[6] For the reasons below, although New York and South Dakota law differ, the outcome at this stage would be the same under South Dakota law.  *See Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 331 (2d Cir. 2005) (differing substantive rules present an "actual conflict" even when they are not "outcome determinative" (citation omitted)); *Dish Network Corp. v. Ace Am. Ins. Co.*, 431 F. Supp. 3d 415, 422 (S.D.N.Y. 2019), ("conflict exists when the applicable law from each jurisdiction provides different substantive rules and those rules have the potential to affect the outcome of the case significantly" (citation omitted)), *aff'd*, 21 F.4th 207 (2d Cir. 2021).

[7] In any event, this factor "carries little weight given the likely absence of any negotiation" in the context of consumer credit card agreements.  *Kulig*, 2013 WL 6017444, at *4.

12

favors New York.  Both the Manhattan address (listed on the Diamond account approval notice) and Centereach address (listed on both the Diamond and Best Buy statements) are in New York. And the transactions on both cards that could ostensibly form the basis of Shirazi's assent to the cardholder agreements occurred almost entirely within New York.  *See* Best Buy Statements I at 27 (listing transactions at restaurants, department stores, and convenience stores in Long Island, New York), 35 (same); Best Buy Statements II at 9 (same); Diamond Statements I at 6, 12, 18, 21 (same).

Because both "the performance and subject matter of the contract favor New York," New York law applies.  *Biggs v. Midland Credit Mgmt., Inc.*, No. 17 Civ. 340, 2018 WL 1225539, at *6 (E.D.N.Y. Mar. 9, 2018) (New York's choice-of-law rules favored applying New York law where consumer "received the Account Agreement and account statements at her address of record in New York"); *see also Tri-State Emp't Servs.*, 295 F.3d at 261 (New York law applied to contract "performed at least in part in New York" between New York corporation and corporation with principal place of business in New York).

### B.       The Best Buy and Diamond Arbitration Provisions

Defendants argue that Shirazi is bound by the arbitration provisions of the Best Buy and Diamond account agreements because she used both cards after receiving the agreements, without objecting to their terms.  Citibank Mot. at 9.  Shirazi, however, disputes receiving or using either the Best Buy or Diamond card.  *See* Shirazi Decl. ¶¶ 5–9.

"To form a contract in New York, there must be 'an offer, acceptance, consideration, mutual assent and intent to be bound,' and a 'contract may be formed by words or by conduct that demonstrate the parties' mutual assent.'"  *Lopez v. Lidl US, LLC*, No. 22 Civ. 4271, 2023 WL 2674757, at *3 (S.D.N.Y. Mar. 29, 2023) (citation omitted).  In the context of consumer credit card agreements, New York law finds mutual assent in the absence of a signed agreement

13

where a consumer (1) makes transactions on a card (2) after receiving the cardholder agreement for it. *Johnson v. Chase Manhattan Bank USA, N.A.*, 784 N.Y.S.2d 921 (Sup. Ct.), *aff'd*, 786 N.Y.S.2d 302 (1st Dep't 2004); *see also Katsnelson v. Citibank Nat'l Ass'n*, 691 F. Supp. 3d 667, 673 (E.D.N.Y. 2023) (New York law requires receipt of terms and use of card in absence of signed writing (citing *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 53 (2d Cir. 2022))).

On a motion to compel arbitration, the "party seeking arbitration bears the initial burden of demonstrating that an agreement to arbitrate exists." *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 115 (2d Cir. 2025). Once that initial burden has been met, the party opposing must "counter with at least '*some evidence* . . . to substantiate [her] denial' that an agreement had been made." *Barrows*, 36 F.4th at 50 (emphasis in original) (quoting *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972)). A "nonmovant['s] affidavits alone" may sufficiently rebut that an agreement has been made, if these identify specific facts that support a general denial as to formation. *Id.* at 50–51 (nonmovant's denial that she accepted terms of electronic agreement was sufficiently supported by her affidavit denying "using any of her employer's computers at her workplace; . . . [or] owning, or even living in a home with, any computer whatsoever.").

The Court assesses whether each account supplies a basis to compel arbitration of Shirazi's claims.

### 1.     The Best Buy Account

A genuine dispute exists, on the limited record presently available, whether Shirazi agreed to the Best Buy cardholder agreement's arbitration provision. A party seeking to compel arbitration often carries its initial burden by producing the arbitration agreement itself. *See Roller v. Centronics Corp.*, No. 87 Civ. 5715, 1989 WL 71200, at *2 (S.D.N.Y. June 22, 1989). Although a moving party need not "show initially that the agreement to arbitrate would be

14

enforceable," it must at least show "that one existed." *Hines*, 380 F. App'x at 24 (emphasis omitted).

Defendants here have not produced the actual Best Buy agreement to which Shirazi purportedly assented. Instead, a Citibank representative attests that Shirazi "was provided" a card agreement "in or around September 2015." First Sabo Decl. ¶ 6. The representative's declaration attaches an ostensible "exemplar" of that agreement. *Id.* But that agreement appears to have been one furnished to another customer in 2022—*seven years* after Citibank states that Shirazi received a card agreement for the Best Buy account. *See* First Sabo Decl. ¶ 6; Best Buy Agreement at 9 ("©2022"). And Citibank's representative attests that its card agreements are "amended from time to time." First Sabo Decl. ¶ 6. Citibank's showing is thus deficient. It fails to substantiate "critical fact[s]," *Katsnelson*, 691 F. Supp. 3d at 671, including (1) the factual basis for its representation that Citibank sent Shirazi a card agreement in approximately September 2015, and (2) the terms of that agreement. Also problematic is the statement by Citibank's representative that Shirazi "did not notify Citibank" she had rejected the arbitration provision. First Sabo Decl. ¶ 9. That statement presupposes that Citibank sent the cardholder agreement to Shirazi, so as to give her an opportunity to assent to or reject its terms. *See Katsnelson*, 691 F. Supp. 3d at 671 ("Citibank's records only show that there was no opting out of the Agreement," not that such was mailed to the consumer); *cf. McPherson v. Bloomingdale's, LLC*, No. 23 Civ. 1084, 2023 WL 8527462, at *5 (E.D.N.Y. Dec. 8, 2023) ("As courts in this Circuit have repeatedly found, signing the Acknowledgment Form *and* failing to timely submit the [opt-out form] constitute an agreement to arbitrate under New York law." (emphasis added)). Defendants thus have not carried their initial burden of showing that a valid arbitration agreement exists.

In any event, Shirazi has come forward with evidence creating genuine disputes of fact whether she (1) received the Best Buy card agreement or (2) later used that card, a fact which would indicate her receipt of the card and bind her to the agreement.  The Best Buy statements list the Centereach, New York address—some 50 miles from Shirazi's Manhattan home—as the account holder's address.  *See* Best Buy Statements I at 1–78; Best Buy Statements II at 1–76.  They reflect purchases made predominantly in and around Centereach.  *See* Best Buy Statements I at 27, 35.  Citibank does not claim that the agreement would have been sent elsewhere.  Shirazi, however, attests that she never lived at the Centereach address; that she never used the card, including in Centereach; and that she never "adopt[ed] any new terms" thereafter.  Shirazi Decl. ¶¶ 5, 7.  Her factual claims, if credited, would support that the card was not sent to her, but instead to an address where it was obtained and used by another.

To be sure, Shirazi states that she cannot "recall with complete certainty" whether she opened the Best Buy account in 2015.  Shirazi Decl. ¶ 4.  "Where a party merely states that she cannot recall *signing an agreement* (as opposed to denying she has done so), such a declaration ordinarily fails to create a triable issue of fact."  *Barrows*, 36 F.4th at 51 (emphasis added).  But Shirazi's lack of recall concerns only the account's opening.  She otherwise unequivocally denies association with the Centereach address or use of the Best Buy card.  Shirazi Decl. ¶¶ 5, 7.  That creates a factual dispute whether she agreed to the card's contractual terms, including the arbitration provision.  "[W]ell-supported allegations of fraud in the formation of an arbitration agreement, such as where the party objecting to arbitration alleges an identity thief opened or otherwise interfered with the agreement containing the arbitration provision, preclude a finding as a matter of law that the parties have an enforceable agreement to arbitrate."  *Haynes*, 2021 WL 7906567, at *5.

16

On the present record, there thus is an unresolved factual dispute whether Shirazi agreed to arbitrate her claims here via the Best Buy cardholder agreement. *See, e.g.*, *id.* at *5–7 (denying motion to compel in light of factual dispute whether plaintiff had used credit card account after receiving agreement mandating arbitration); *Romain v. Citibank, N.A.*, No. 24 Civ. 2933, 2025 WL 2980525, at *3 (E.D.N.Y. Sept. 29, 2025) ("The cases Citibank cites in its motion prove th[e] point: notice must be established before card use binds the cardholder to the arbitration clause in the Agreement."); *Katsnelson*, 691 F. Supp. 3d at 673 (card usage did not constitute assent to terms of card agreement which plaintiff denied receiving).

### 2.    The Diamond Account

On the present record, a genuine dispute of fact also exists as to whether Shirazi agreed to the Diamond cardholder agreement's arbitration provision.

"[I]n reviewing motions to compel arbitration, just as for motions for summary judgment, a court must 'consider *all* relevant, admissible evidence . . . .'" *Barrows*, 36 F.4th at 50 (emphasis in original) (quoting *Nicosia*, 834 F.3d at 229). A non-movant's affidavits can suffice to defend against such a motion. *Id*. (citing *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998)). That said, a party "normally does not show the existence of a genuine issue of fact . . . merely by making assertions that are based on speculation or are conclusory." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021). She must instead provide at least "some evidence" substantiating a general denial, which may include further averments. *Barrows*, 36 F.4th at 5 (citation omitted).

Shirazi has done so here. Citibank submitted an agreement that bears her name and her Manhattan mailing address. *See* Diamond Agreement at 1. Shirazi unequivocally denies opening the Diamond account or using that card. Shirazi Decl. ¶¶ 5, 8–9. And she attests to specific facts supporting her claim that an identity thief—not Shirazi—opened the Diamond

account and made transactions on the associated credit card. For one, she denies living at the Centereach address—the address listed on and to which the Diamond billing statements were mailed. *See* Shirazi Decl. ¶ 7; Diamond Statements I; Diamond Statements II. For another, she denies making or paying off any of the many transactions listed on the Diamond card's bills— the large majority of which also took place in Centereach. *See, e.g.*, Shirazi Decl. ¶ 5; Diamond Statements I at 4, 6, 44 (listing transactions at stores in Centereach). Shirazi has thus come forward with evidence supporting her general denial, creating a genuine dispute as to contract formation. *Barrows*, 36 F.4th at 50.

### C.    The Macy's Account Arbitration Provision

Citibank alternatively argues that, even if the Best Buy and Diamond agreements do not bind Shirazi to arbitrate her claims arising from those accounts, she is required to arbitrate these disputes based on the arbitration agreement for the separate Macy's account. Citibank Mot. at 11–13. Shirazi does not dispute that she opened and used the Macy's credit card account, and thus is bound by its arbitration agreement. *See* Shirazi Decl. ¶¶ 1–9; Opp'n at 8. She argues, however, that her claims based on the Best Buy and Diamond cards do not "aris[e] out of," and are not "related to," her "relationship" with Citibank, as required to come within that arbitration provision. Opp'n at 5–11. Shirazi is correct.

### 1.    Legal Standards Governing Scope of Agreements to Arbitrate

"The question whether the parties have submitted a particular dispute to arbitration . . . is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (cleaned up).[8]

---

[8] Although LVNV and Resurgent argue that the Best Buy Agreement delegates the question of the scope of arbitrability to the arbitrator, *see* LVNV/Resurgent Mot. at 9, no party argues that the Macy's agreement does so. To the contrary, Citibank asks the Court to construe the scope of that agreement. *See* Citibank Mot. at 10–13.

18

Courts in this Circuit previously began this analysis by "classify[ing] the particular [arbitration] clause as either broad or narrow," *Keystone Food Holdings, Ltd. v. Tyson Foods, Inc.*, 492 F. Supp. 3d 134, 143 (S.D.N.Y. 2020) (citation omitted), but today, "[c]ourts can no longer rely on broad arbitration clauses to presume arbitrability in the first instance," *Galanova v. Morgan Stanley Servs. Grp. Inc.*, No. 23 Civ. 183, 2023 WL 6198823, at *4 (S.D.N.Y. Sept. 22, 2023) (citing *Loc. Union 97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 114 (2d Cir. 2023)).  Rather, courts must first turn to "ordinary principles of contract interpretation" to assess whether the "particular dispute is covered by the language to which the parties agreed." *Local Union 97*, 67 F.4th at 114.  "[T]he presumption of arbitrability is a court's last, rather than first, resort" and is invoked "only where the parties' dispute concerns a valid and enforceable agreement to arbitrate that is ambiguous as to its scope." *Id*. at 113–14; *see also Silver v. Nissan-Infiniti LT, LLC*, 724 F. Supp. 3d 217, 222 (S.D.N.Y. 2024).

### 2.    Application to the Macy's Agreement

The Macy's arbitration agreement covers "any claim, dispute or controversy between you and us arising out of or related to your account, a previous related account or our relationship (called 'Claims')."  Macy's Agreement at 5.  Citibank argues that Shirazi's claims, which arise from charges on the Best Buy and Diamond accounts, fall within that provision because they arise out of a relationship between her and Citibank, which services the Macy's account.  *See* Citibank Mot. at 11–12.  That argument fails for two reasons.

First, under the terms of the contract, "our relationship" refers to Shirazi's relationship with "Department Stores National Bank"—a Citibank subsidiary that issued the Macy's account.  *See* Macy's Agreement at 5.  The agreement states: "**[W]e, us, and our** mean Department Stores

19

National Bank." *See* Macy's Agreement at 4 (emphasis in original).[9]  An arbitration provision must be interpreted consistently with its own defined terms.  *Dannhauser v. TSG Reporting, Inc.*, No. 16 Civ. 747, 2019 WL 2950142, at *9 (S.D.N.Y. June 21, 2019) ("Under New York law, when a term is expressly defined in a contract, the agreed-to definition generally supersedes any other meaning of the term.").  The Macy's arbitration provision covers claims to be "made by or against anyone connected with us or you, . . . such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company," but these must still arise from, or be related to, the relationship between Shirazi and Department Stores National Bank.  *Id.* at 5. On the present record, however, Shirazi's claims concern only the relationship between her and Citibank, not Department Stores National Bank.  They are thus not covered by the Macy's arbitration agreement.  *See, e.g.*, *Haynes*, 2021 WL 7906567, at *8 (finding identical language in arbitration agreement under Macy's credit card not to cover claims against Citibank, because it only referred to Department Stores National Bank without referencing Citibank); *see also Madorskaya v. Frontline Asset Strategies, LLC*, No. 19 Civ. 895, 2021 WL 3884177, at *7 (E.D.N.Y. Aug. 31, 2021) ("Defendant is plainly not included in the 'you' or 'we' who 'may arbitrate.'").

Second, even if Citibank were party to the "relationship" defined by the Macy's agreement, Shirazi's claims regarding the Best Buy and Diamond accounts do not arise out of or relate to that relationship (or to any "previous related account" with Citibank).  On the contrary: on the present record, they appear to arise only from an ostensible relationship between Citibank

---

[9] In contrast, the Diamond and Best Buy card agreements explicitly define Citibank as the entity whose relationship governs the arbitrability of claims.  *See* Best Buy Agreement at 1 ("**we**, **us**, and **our** mean Citibank, N.A., the issuer of your account." (emphasis in original)); Diamond Agreement at 6 (similar).

and an unknown identity thief.  That is because, as noted, Shirazi attests that she has never resided at the Centereach address listed under the Best Buy and Diamond accounts, near which almost all transactions on both cards occurred, and that she never used either card.  Shirazi Decl. ¶ 7; *see also* Best Buy Statements I at 27, 35 (listing transactions in or near Centereach); Diamond Statements I at 6, 12, 18, 21 (same).

This decision accords with cases similarly holding that an arbitration agreement for a validly opened credit card account does not cover claims arising from separate, fraudulent accounts.  *See, e.g.*, *Guerrero v. Citibank, N.A.*, No. 25 Civ. 1426, 2025 WL 2483161, at *5–6 (N.D. Cal. Aug. 28, 2025) (plaintiff's cardholder arbitration agreement with Citibank did not cover separate accounts opened by identity thieves without her permission); *Van Dijen v. Equifax Info. Servs. LLC*, No. 23 Civ. 5908, 2024 WL 2133952, at *5 (W.D. Wash. May 13, 2024) (same); *Holloway*, 2024 WL 1806427, at *3 (same).  The FAA "does not countenance motions to compel arbitration of claims that lack a requisite 'nexus' to the contract containing the arbitration clause."  *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 121 (2d Cir. 2025) (Pérez, J., concurring); *see also McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 277–79 (S.D.N.Y. 2021) ("[c]laims arising out of or relating to" relationship between parties to arbitration agreement did not cover claims lacking any nexus to that agreement); *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 503–05 (E.D.N.Y. 2016) (same).  The Macy's account arbitration agreement thus does not cover Shirazi's claims concerning the Best Buy and Diamond accounts.

**D.    Overall Assessment**

Because the Macy's account arbitration agreement does not supply a basis to compel arbitration of Shirazi's claims, the only potential bases to do so are the arbitration provisions associated with the Best Buy and Diamond accounts.  But, on the sparse record at hand, there are material factual disputes as to whether Shirazi agreed to those.  For that reason, the Court has

ordered expedited discovery and supplemental briefing aimed at enabling resolution of those issues. *See* Dkt. 48. The Court identified the following areas as potentially probative: whether Shirazi was associated with (1) the Centereach address, (2) the means used to make payments on the Best Buy and Diamond accounts, and (3) the purchases reflected in the billing statements for those cards. *Id.* at 2.

The Court accordingly defers judgment on the motions, pending that discovery and briefing. *See, e.g.*, *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 104 (2d Cir. 2022) (where record "insufficiently developed" to determine whether party entered into arbitration agreement, court should not deny motion to compel arbitration outright, but should "require[] further evidence or proceed[] to trial" on issue of arbitrability); *Ayad v. PLS Check Casher of N.Y., Inc.*, No. 20 Civ. 1039, 2021 WL 4272472, at *4 (E.D.N.Y. Sept. 21, 2021) (deferring judgment on motion to compel arbitration pending additional factfinding); *Simmons v. SUNco Cap., LLC*, No. 24 Civ. 7129, 2025 WL 711724, at *5 (E.D.N.Y. Mar. 5, 2025) (similar); *Schuchmann v. Great Am. Power, LLC*, No. 23 Civ. 1604, 2024 WL 219267, at *5 (M.D. Pa. Jan. 19, 2024) (similar).

## CONCLUSION

For the above reasons, the Court defers judgment on defendants' motion to compel arbitration, pending further discovery and supplemental briefing, as directed in the Court's Orders of February 18 and March 13, 2026. Dkts. 48, 53.

SO ORDERED.

Paul A. Engelmayer

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: March 31, 2026
      New York, New York